UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                     Civil No. 1:21-cv-

      vs.

$148,538.00 IN FUNDS FROM
CETERA INVESTMENT SERVICES
LLC SIMPLIFIED EMPLOYEE
PENSION PLAN, HELD FOR THE
BENEFIT OF AHAD E. LOTFI,
BEARING ACCOUNT NUMBER
2MD01180,

      Defendant.

_____/

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

NOW COMES Plaintiff, United States of America, by and through its attorneys, Andrew Byerly Birge, United States Attorney for the Western District of Michigan, and Daniel T. McGraw, Assistant United States Attorney, and states upon information and belief that:

### NATURE OF THE ACTION

1.     This is a civil forfeiture action filed pursuant to 18 U.S.C. § 981(a)(1)(C) and Supplemental Rule G(2) of the Federal Rules of Civil Procedure to forfeit and condemn to the use and benefit of the United States of America $148,538.00 in funds from Cetera Investment Services LLC Simplified Employee Pension Plan, held for the benefit of Ahad E. Lotfi, bearing Account Number 2MD01180 ("the Defendant Property").

1

## THE DEFENDANT IN REM

2.    The Defendant Property consists of $148,538.00 in funds that was seized on or about February 4, 2021 by the Federal Bureau of Investigation (FBI) in St. Cloud, Minnesota from Cetera Investment Services LLC Simplified Employee Pension Plan, held for the benefit of Ahad E. Lotfi, bearing Account Number 2MD01180 ("the Subject Account"). The Defendant Property is currently in the custody of the United States Marshals Service (USMS).

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1345 and 1355(b)(1)(A) because this action is being commenced by the United States of America as plaintiff and the acts giving rise to the basis for forfeiture occurred in the Western District of Michigan.

4.    Venue is proper before this Court pursuant to 28 U.S.C. § 1355(b)(1), because the acts or omissions giving rise to forfeiture occurred in this judicial district, and/or pursuant to 28 U.S.C. § 1395(c), because the Defendant Property was seized outside this judicial district but was subsequently brought into this judicial district.

## BASIS FOR FORFEITURE

5.    As set forth below, the Defendant Property is subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 1956(c)(7)(F) as property that constitutes or is derived, directly or indirectly, from proceeds traceable to violations of the health care fraud statute, 18 U.S.C. § 1347.

2

## FACTS SUPPORTING FORFEITURE

### I.    Background

6.      From 2013 through 2017, Ahad E. Lotfi was a doctor of chiropractic medicine, who was licensed to practice in the State of Michigan and owned and operated a chiropractic business under the name of Ahad E. Lotfi, D.C., P.L.L.C.

7.      Dr. Lotfi's chiropractic business operated offices in the cities of Bangor, Hartford, Paw Paw, and South Haven, all in the Western District of Michigan.

8.      Dr. Lotfi was a participating provider with Blue Cross-Blue Shield of Michigan (BCBSM) and Michigan Education Special Services Association (MESSA), a non-profit corporation that provides health insurance to public school employees in the State of Michigan.

9.      Both BCBSM and MESSA are health care benefit programs as defined in 18 U.S.C. § 24(b). BCBSM administered the MESSA insurance program and processed the claims submitted by Dr. Lotfi and paid by MESSA for chiropractic treatment and orthotic shoe inserts provided to MESSA members. BCBSM's general policy and participating provider agreement terms applied to Dr. Lotfi when billing MESSA insurance, subject to any supplemental guidance from MESSA.

10.     Dr. Lotfi billed insurers, including BCBSM and MESSA, for office examinations, chiropractic adjustments, and other chiropractic services, including orthotic shoe inserts.

3

## II.    Claims for Covered Services

11.    A claim for payment is submitted to a health care benefit program on Health Care Financing Administration Form 1500. For a claim to be paid by the health care benefit program, the Form 1500 had to document each service rendered to the plan member by the healthcare provider. The services are identified through a corresponding procedure code listed in the American Medical Association (AMA) publication called the Current Procedural Terminology (CPT) Manual. The CPT Manual contains a systematic list of codes for procedures and services performed by or at the direction of a physician or other healthcare providers, including chiropractors. In addition to the CPT coding manual, the Healthcare Common Procedure Coding System (HCPCS) manual is used to bill for additional items not listed in the CPT manual. These items include durable medical equipment like orthotic shoe inserts.

12.    The AMA also published the International Classification of Diseases (ICD-9) Manual, which assigns a unique numeric identifier to numerous diseases and medical conditions. In order to be properly payable by healthcare benefit programs, a claim on Form 1500 must include the proper ICD-9 code specifying the underlying medical condition or disease necessitating the medical procedure, treatment, or durable medical equipment. Payment for services by the healthcare benefit programs depends upon the CPT, HCPCS, and ICD-9 codes listed on the claim form.

13.    Additionally, even if a health insurance claim for payment specifies the appropriate codes, BCBSM and MESSA only pay health care practitioners for

4

"covered services." Covered services include only those health care services which are, among other things, "medically necessary" or performed or provided out of "medical necessity."

14.     From 2013 through 2017, BCBSM's participation agreement defined the terms "medically necessary" and "medical necessity" as health care services that a practitioner, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing, or treating an illness, injury, disease, or its symptoms, and that are in accordance with generally accepted standards of medical practice. The participation agreement further provided that such services must also be clinically appropriate in terms of type, frequency, and effectiveness, and not primarily for the convenience of the insured member.

15.     In submitting claims for payment to the healthcare benefit programs, providers certified on the paper or electronic version of Form 1500 that the information on the claim form presented an accurate description of the services rendered and that the services were medically necessary.

### III.     Orthotic Shoe Inserts

16.     A removable orthotic shoe insert is an orthotic device that is molded to fit a patient's foot and that provides longitudinal and metatarsal support. A properly prescribed orthotic shoe insert can potentially be used to correct or relieve conditions in the spine, hips, feet, and legs.

17.     Under MESSA's insurance plan, orthotic shoe inserts could be properly payable as a covered service, when they were medically necessary and prescribed by

5

a physician, chiropractor, or other appropriate healthcare provider. MESSA's policies additionally required that the healthcare provider prescribing the orthotic shoe insert affirm that the orthotics were medically necessary because a patient was missing a certain body part or the orthotic would otherwise improve the function of the patient's body.

18.     Removable orthotic shoe inserts are billed using HCPCS code L3020.

19.     Once an orthotic shoe insert is properly prescribed and billed, additional orthotic shoe inserts for the same patient are properly payable by MESSA as a covered service if they are medically necessary and prescribed due to wear and tear of the initial orthotic or growth of the patient's foot.

20.     Generally, MESSA reimbursed Dr. Lotfi at a rate of $200 per orthotic shoe insert (or $400 per pair), although on some occasions the reimbursement was $145 per insert (or $290 per paid), or $55 per insert (or $110 per pair).

## IV.     Dr. Lotfi's Scheme to Defraud

21.     Dr. Lotfi carried out a scheme to defraud BCBSM and MESSA by submitting health care insurance claims for removable orthotic shoe inserts under HCPCS code L3020 that were not medically necessary.

22.     It was part of the scheme to defraud that Dr. Lotfi regularly told his patients that MESSA would pay for multiple pairs of shoes each calendar year. Dr. Lotfi then persuaded his patients to allow him to scan their feet using a proprietary scanning technology owned by Foot Levelers, Inc. The Foot Levelers scanner digitally

recorded measurements of the patient's feet and relayed the measurements to Dr. Lotfi's computer.

23.    Dr. Lotfi then provided the patients with shoe catalogs provided by Foot Levelers. These catalogs contained name-brand shoes from which Dr. Lotfi encouraged the patients to choose multiple pairs.

24.    After the patients selected the shoes, Dr. Lotfi ordered the shoes, along with removable orthotic shoe inserts for each pair of shoes, from Foot Levelers. Dr. Lotfi provided Foot Levelers with the measurements electronically recorded from the scan of the patient's feet and Foot Levelers produced the custom orthotic shoe inserts fitted to the name-brand shoes selected by the patient.

25.    It was further part of the scheme to defraud that Dr. Lotfi did not take any medical history from the patients or perform any physical examination of the patients required to establish the medical necessity for the orthotic shoe inserts, nor did he properly document such findings in his medical chart.

26.    In carrying out the scheme, Dr. Lotfi ordered his staff to call patients each calendar year to remind them and to persuade them to order additional shoes. For patients who agreed, Dr. Lotfi ordered additional shoes and orthotic shoe inserts without seeing many of the patients at all, without performing any additional scan of the patients' feet, or any evaluation of the patient to determine medical necessity for these additional orthotic shoe inserts.

27.    Dr. Lotfi also furthered the scheme by staggering the submission of health care forms to BCBSM and MESSA for orthotic shoe inserts billed under HCPS

code L3020 throughout the calendar year. Although Dr. Lotfi ordered multiple pairs of shoes and orthotic shoe inserts from Foot Levelers at the same time, he directed his staff to submit health care forms to BCBSM and MESSA at times he directed throughout the calendar year. On many occasions, Dr. Lotfi back-dated the dates of service for which he claimed to have performed examinations necessary to justify the orthotic shoe inserts so that the dates of service on the health care claim form actually pre-dated the actual date that the individual became a patient at his office. This allowed Dr. Lotfi to avoid raising suspicion with MESSA by submitting claims for payment associated with orthotic shoe inserts on the same date or for dates of service in close proximity with one another.

28.     Dr. Lotfi also carried out his scheme by telling his patients that MESSA would pay for shoes for their family members. As a result, Dr. Lotfi persuaded the patient's family members to allow him to scan their feet and order shoes and shoe inserts, frequently without any medical history, physical examination, or even a true doctor-patient relationship.

29.     Dr. Lotfi also carried out his fraud by taking the scanner and a computer to various high schools where he represented to teachers and other staff that they could receive multiple pairs of shoes paid for by MESSA. Dr. Lotfi would then persuade teachers and staff to provide him with their health insurance cards and to allow him to scan their feet. Many of these teachers and staff were never truly patients of Dr. Lotfi's chiropractic practice and received shoes and orthotic inserts

8

paid for by MESSA without any medical history, physical examination, or findings justifying medical necessity for the prescribing of the orthotic shoe inserts.

30.     From 2013 through 2017, Dr. Lotfi submitted health insurance claims to MESSA under billing code L3020 totaling $1,919,932.00 and received payment in the amount of $1,001,539.75.

## V.     The Defendant Property is Fraud Proceeds

31.     During the time period of the scheme to defraud, Dr. Lotfi maintained a personal checking account ending 2903 and business checking account ending 8960 at Chemical Bank.

32.     A review of records for business checking account ending 8960 showed that the account regularly received deposits from health insurance companies. In particular, from 2014 through 2017, the business checking account ending 8960 received deposits in the total amount of $2,687,76.23, which included regular deposits from MESSA and BCBS, and had withdrawals in the total amount of $2,960,774.78.

33.     A review of records for personal checking account ending 2903 showed that the account regularly received deposits from the business checking account ending 8960, at times and in amounts consistent with what appeared to be weekly paychecks from Dr. Lotfi's business. From 2014 through 2017, the personal checking account ending 2903 received deposits for $906,225.90 and had withdrawals of $923,202.66.

34.     Dr. Lotfi withdrew money from business checking account ending 8960 and deposited the funds into the Subject Account on the following dates:

9

      a. April 11, 2014: check number 2025 in the amount of $5,500.00 deposited into the Subject Account;

      b. April 10, 2015: check number 2151 in the amount of $28,393.00 deposited into the Subject Account; and

      c. April 15, 2016: an electronic funds transfer in the amount of $40,605.00 into the Subject Account.

35.    Similarly, Dr. Lotfi made the following withdrawal from personal checking account ending 2903 on the following date:

      a. April 12, 2017: an electronic funds transfer in the amount of $6,500.00 into the Subject Account.

36.    In each year, from 2014 through 2017, Dr. Lotfi made transfers to the Subject Account the day before the applicable deadline for filing federal taxes, which, upon information and belief, was to shield some of his income from self-employment and income taxes.

37.    Fraud proceeds deposited into the business checking account ending 8960 funded the payments or deposits into the Subject Account. Specifically, in January, February, March, and part of April in 2014, 2015, and 2016, business checking account ending 8960 predominantly received deposits from MESSA in amounts of $400, $290, or $110 (fraudulent orthotic claims, as described above). As depicted in the table below, Dr. Lotfi received $549,654.44 in total MESSA deposits from January to mid-April in each of 2014, 2015, and 2016:

10

| Year | Month | Total Monthly Deposits (All Sources) | Total Monthly Deposits (MESSA only) | Total MESSA Deposits (January to mid-April) |
|------|-------|------|------|------|
| 2014 | January | $68,692.91 | $12,430.00 | |
| | February | $28,895.74 | $13,247.58 | |
| | March | $32,892.17 | $5,542.00 | |
| | April | $70,304.56 | $10,307.10 | $41,526.58 |
| 2015 | January | $114,703.63 | $57,944.96 | |
| | February | $33,095.46 | $0 | |
| | March | $28,326.66 | $9,268.00 | |
| | April | $83,742.66 | $32,920.00 | $100,132.96 |
| 2016 | January | $282,062.67 | $191,389.10 | |
| | February | $217,024.79 | $134,755.29 | |
| | March | $64,852.82 | $10,000.00 | |
| | April | $144,934.55 | $71,850.51 | $407,994.90 |
| Total MESSA Deposits for Jan. to mid- April 2014 to 2016 | | | | $549,654.44 |

38.    Based on billing data from MESSA, during 2014, 2015, and 2016, MESSA reimbursed Dr. Lotfi for billings associated with CPT code L3020 in the amounts of $400, $290, or $110 for each pair of orthotic shoe inserts. The majority of the MESSA deposits for the months and years reflected in the table above are in the amounts of $400, $290, or $110. Therefore, although the monthly and yearly totals for MESSA deposits into business checking account ending 8960 included payments for items other than orthotic shoe inserts (i.e., massage therapy, etc.), the MESSA deposits to business checking account ending 8960 as reflected in the table above are primarily proceeds of Dr. Lotfi's health care fraud scheme.

39.    Based on records for the Subject Account received from Cetera Investment Services, the Subject Account was funded with withdrawals from the business checking account ending 8960 and personal checking account ending 2903 with proceeds of Dr. Lotfi's health care fraud scheme.

## CLAIM I
### (Forfeiture of Proceeds of Health Care Fraud)

40.    Plaintiff hereby incorporates by reference the allegations set forth in paragraphs numbered 1 through 41, as referenced above.

41.    The Defendant Property is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes, or is derived from proceeds traceable to a violation of 18 U.S.C. § 1347.

## RELIEF

Wherefore, the United States prays that the usual process for forfeiture issue against the Defendant Property; that due notice be given to all interested parties to appear and show cause why forfeiture to the United States of America should not be decreed; and that the Defendant Property be condemned and forfeited to the United States of America and be delivered into the custody of the Federal Bureau of Investigation or the United States Marshals Service for disposition according to law; and for such other relief as this Court may deem just and proper.

ANDREW BYERLY BIRGE
United States Attorney

Dated: July 19, 2021

DANIEL T. McGRAW
Assistant United States Attorney
P.O. Box 208
Grand Rapids, MI 49501-0208
(616) 456-2404

## **VERIFICATION**

I am a Special Agent with the Federal Bureau of Investigation and am one of the agents assigned to this case. I have read the contents of the foregoing Verified Complaint for Forfeiture *In Rem* and the statements contained therein are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 19, 2021

TIFFANY EAGLES
Special Agent
Federal Bureau of Investigation

13